OPINION
Defendant-appellant, Martin D. Rivera-Carillo, appeals his conviction in the Butler County Court of Common Pleas for murder.
On July 15, 2000, at the beginning of his 7 a.m.-3 p.m. shift, Paul Davis, a police officer with the Hamilton Police Department, saw Tracey Roark at the corner of Seventh and Ludlow Streets in Hamilton, Ohio. Tracey was waiting for someone to come by and pick her up. Around 8:15 a.m. that morning, Officer Davis and his partner were involved in a traffic stop on Ludlow Street when they observed a 1987 GMC Safari van driven by appellant drive past them going northbound on Seventh Street. Blood was dripping through the open sliding door of the van. The officers activated the overhead lights of their police cruiser and pulled appellant over. Appellant had a lot of blood on him. Appellant did not have a driver's license and was unable to provide an identification. When asked by Officer Davis whether appellant or someone else was injured, appellant replied "no" to both questions. When asked about the source of the blood, appellant told the officer that he had just killed a baby cow. Appellant was eventually arrested[1] for failure to have a driver's license and taken to the police station to be booked.
Tracey's body was discovered that same day in a lot near Sixth and Rigdon Streets. Her body was next to a dumpster and had a large slice wound to the neck. Charles N. Hurwitz, M.D., a pathologist who performed an autopsy on Tracey, ruled that the cause of death was exsanguination, that is, that Tracey had bled to death. The autopsy showed fifty wounds on Tracey's body. Appellant eventually confessed to killing Tracey as follows:
 This morning I was driving my van and I picked up a girl at 7th and Ludlow St. She wanted a ride, and she wanted me to take her up the street. I did not know she was a prostitute, and I did not want to have sex with her. When she got in the van I had $40.00 laying by the glove compartment, and she grabbed the money and stuck it in her pocket. She then started to get out of the van and I grabbed her arm and told her she could not get out until she gave me my money back. When I grabbed her she reached down between the seats and grabbed my razor knife [a carpenter knife used by appellant in his drywall job] and tried to stab me with it. I then grabbed her hand and was trying to get the knife away from her. We were fighting for the knife and the knife went into her throat. As we were continuing to fight she got stabbed in the chest several times. I was very angry that she had tried to take my money, and when she got cut I was very scared. I remember that I grabbed her by the hair when I was fighting with her. After she was cut and bleeding, and I had blood all over me I was very scared and I took her over by the train tracks and threw her out of the van. I remember that when we [were] fighting that she kept saying that she did not want to die. I don't remember how many times that I stabbed her, because I was a little drunk, but I do know that I stabbed her in the neck area, and in the chest. I kept telling her to let go of the knife and give me my money back. I did this whole thing in self-defense, I was defending myself. The fight did not take place where I threw her body, it took place in an intersection of 7th St. and an alley. I took her by the dumpster, because I did not want anyone to see me throw her out. * * *
Appellant was indicted in August 2000 on one count of murder, and tried to a jury on February 5-7, 2001. Prior to the jury's deliberations, the trial court gave the jurors an instruction on voluntary manslaughter. On February 7, 2001, a jury found appellant guilty of murder as charged. This appeal followed in which appellant raises eleven assignments of error.
Assignment of Error No. 1:
 THE TRIAL COURT ERRED BY OVERRULING DEFENDANT'S MOTION TO SUPPRESS.
In his first assignment of error, appellant argues that his constitutional rights were violated[2] and that all of the statements he made to the police from the time he was pulled over should be suppressed. Specifically, appellant first asserts that Miranda warnings should have been given to him as soon as he was pulled over because all of his statements were made during the course of a custodial interrogation.
When considering a motion to suppress evidence, the trial court serves as the trier of fact and is the primary judge of the weight of the evidence and the credibility of witnesses. State v. Fanning (1982),1 Ohio St.3d 19, 20. When reviewing a trial court's decision on a motion to suppress, an appellate court accepts the trial court's findings if they are supported by competent, credible evidence, State v. McNamara
(1997), 124 Ohio App.3d 706, 710, and relies upon the trial court's ability to assess the credibility of witnesses. State v. Anderson
(1995), 100 Ohio App.3d 688, 691. An appellate court must then determine without deference to the trial court whether the trial court has applied the appropriate legal standard. Id.
The "prosecution may not use statements * * * stemming from a custodial interrogation unless it demonstrate the use of procedural safeguards effective to secure the privilege against self-incrimination." Mirandav. Arizona (1966), 384 U.S. 436, 444, 86 S.Ct. 1602, 1612. Custodial interrogation means "questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way." Id. Encompassed in this definition are two distinct concepts: custody and interrogation. When both factors are present, law enforcement officers must advise an individual of his constitutional rights to insure that self-incriminating statements made by that individual are the result of free choice. Id. at 457, 86 S.Ct. at 1619.
Custody encompasses a formal restraint or restraint of movement of the degree associated with a formal arrest. California v. Beheler (1983),463 U.S. 1121, 1125, 103 S.Ct. 3517, 3520. "Under this standard, a suspect obviously is in custody if he is formally placed under arrest prior to interrogation. Where the suspect has not been formally arrested, the restraint on the suspect's freedom of movement must be significant in order to constitute custody." State v. Staley (May 8, 2000), Madison App. No. CA99-08-019, unreported, at 7.
"The term `interrogation' under Miranda refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Rhode Island v. Innis (1980), 446 U.S. 291,301, 100 S.Ct. 1682, 1689-1690. See, also, State v. Knuckles (1992),65 Ohio St.3d 494, paragraph two of the syllabus, certiorari denied (1993), 508 U.S. 981, 113 S.Ct. 2986 ("when a statement, question or remark by a police officer is reasonably likely to elicit an incriminating response from a suspect, it is an interrogation").
However, the Miranda rules do not prevent the use as evidence of every statement made by a person in custody. "Any statement given freely and voluntarily without any compelling influences is, of course, admissible in evidence." Innis at 299-300, 100 S.Ct. at 1689. "`Interrogation' as conceptualized in the Miranda opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself." Id.
As previously noted, appellant was pulled over when the officers observed blood dripping from the open sliding door of the van. Officer Davis testified that he pulled appellant over because the officer was concerned someone needed medical attention. Law enforcement officers may legitimately effect traffic stops, for purposes other than criminal investigation, to determine whether a person is in need of assistance. See State v. Carlile (May 14, 1999), Montgomery App. No. 17270, unreported. Under the circumstances, the investigatory stop of appellant's van was proper.
Officer Davis approached the van's driver's window and asked appellant whether he was hurt. Appellant replied he was not. The officer asked for appellant's driver's license. Appellant could not provide one. The officer then asked about the source of the blood. Appellant replied he had just killed a baby cow. At that point, the officer called his supervisor, Sergeant McMannis. While waiting for Sgt. McMannis to arrive, Officer Davis did not speak to appellant who was still in the van. Upon arriving at the scene, the sergeant asked appellant about the source of the blood. Again, appellant replied he had killed a baby cow.
Following his answer to the sergeant, appellant was placed in the back of a police cruiser. Appellant was never handcuffed while in the police cruiser. Thereafter, the sergeant asked appellant where he had killed the cow. After being given an address on Fourth Street by appellant, the sergeant and another officer went to the address. No cow was found. Subsequently, appellant agreed to go to the Fourth Street address with the sergeant and Officer Davis. Again, no cow was found. Appellant was still in the police cruiser.
General on-the-scene questioning as to facts surrounding a crime or other general questioning of citizens in the fact-finding process ordinarily does not fall within the ambit of custodial interrogation.Miranda, 384 U.S. at 477, 86 S.Ct. at 1629. That is because such general questioning is only an attempt to elicit basic facts relative to the officer's investigation. State v. Sadler (Nov. 4, 1991), Madison App. No. CA91-02-005, unreported, at 7. "Having an individual sit in a police cruiser for a short time to answer a few questions does not necessarily elevate the situation to something greater than a traffic stop." Statev. Johnson (May 1, 2000), Clermont App. No. CA99-06-061, unreported, at 8. This is true when the individual is being requested to stay while relevant facts are ascertained. Id.
We find that Miranda warnings were not required during the foregoing situation. Although appellant obviously was not free to simply drive away while he was in his van, Officer Davis' and Sgt. McMannis' questions to appellant were merely on-the-scene inquiries done as part of the normal fact-finding process. The questioning by both the officer and the sergeant did not therefore constitute custodial interrogation. Nor was appellant's placement in the cruiser as part of the investigation a custodial placement. See id. Miranda warnings at that point in time were therefore unnecessary.
After no cow was found on Fourth Street, appellant was formally arrested for failure to have a driver's license and transported to the police station to be booked. From that point on, there is no question that appellant was in custody for purposes of Miranda. Steve Rogers, a detective with the Hamilton Police Department, arrived at the police station while appellant was being booked. Det. Rogers asked appellant about the blood. Appellant again replied he had killed a baby cow. While looking at appellant from head to toe, the detective noticed hair entangled in the eyelet of appellant's right boot. The detective commented "[t]hat doesn't look like cow to me. If that's human hair, you've got a problem." Appellant stated "I have a problem."
Det. Rogers did not ask any more questions and left the police station to go look at appellant's van. Before leaving the station, he specifically instructed police officers not to talk to appellant while the detective was in the field. Det. Rogers testified he had no evidence that anybody talked to appellant while the detective was gone. While en route to the van, Det. Rogers was notified that Tracey's body had been discovered. Upon his return to the police station several hours later, Det. Rogers and another detective took appellant to an interview room to question him. Before appellant's interrogation started, however, Tammy Allen, a translator teaching Spanish at Miami University, read appellant his Miranda rights in Spanish. Allen also gave appellant a Miranda
warning card in Spanish which appellant signed. Upon reading appellant his Miranda rights, Allen asked him if he understood he had no obligation to speak to the detectives without the presence of an attorney. Appellant indicated he understood, stated he did not need an attorney, and stated that he wanted to speak to the detectives without an attorney present. Thereafter, appellant confessed to killing Tracey.
The record clearly shows that appellant was read his Miranda rights before he confessed to killing Tracey. Appellant's confession was therefore properly obtained and admissible. Problematic, however, are Det. Rogers' question (about the source of blood) and comment (about human hair) to appellant made while appellant was in the booking room. At that point in time, appellant was clearly in custody; yet, he had not been read his Miranda rights. In its brief, although it refers to the question and the comment, the state does not address appellant's challenge to this apparent Miranda violation, but rather, glosses over it.
Although appellant was at that time subjected to custodial interrogation without prior warnings in derogation of Miranda, we find that the trial court's failure to suppress appellant's answers to the detective's question and comment was harmless error. See State v.Edgell (1972), 30 Ohio St.2d 103 (holding that the harmless error doctrine is applicable to Miranda violations). Appellant's answer, that he had killed a cow, was identical and repetitious of the statements appellant made at the scene of the traffic stop before his arrest. In addition, that particular answer had very little significance at trial. See State v. Lee (Dec. 31, 1997), Trumbull App. No. 95-T-5371, unreported. With regard to appellant's statement he had a problem, we find that it was a statement given freely and voluntarily in answer to Det. Rogers' off hand comment (which was not in the form of a question). See State v. Tucker (1998), 81 Ohio St.3d 431. To that extent, we find that the trial court properly denied appellant's motion to suppress.
Appellant next asserts that the Miranda warnings that were finally given were deficient. Specifically, appellant asserts that in light of the fact that he only has a second grade education and is not fluent in English, and the fact that Allen, by her own admission, had not been formally trained in translation, the Miranda rights read to him in Spanish were "not a sufficiently clear recitation of what is required perMiranda[.]"
As we stated in State v. Gomez-Silva (Dec. 3, 2001), Butler App. No. CA2000-11-230, unreported, "[t]here is no rigid rule requiring that the content of the Miranda warnings given to an accused be a virtual incantation of the precise language contained in the Miranda opinion."Id. at 5. A translation of a suspect's Miranda rights need not be perfect or verbatim if the suspect understands that he need not speak to the police, that any statement made may be used against him, that he has a right to an attorney, and that an attorney will be appointed if he cannot afford one." State v. Ramirez-Garcia (2001), 141 Ohio App.3d 185,188, citing Duckworth v. Eagan (1989), 492 U.S. 195, 210-215,109 S.Ct. 2875, 2884-2887.
Allen has a Bachelor's degree in Spanish and is a tenured senior Spanish instructor at Miami University. Allen testified that she lived in Columbia for one year in 1978, has lived in Spain, and has spent three summers in Mexico. Although she admitted not being formally trained in translation, she also testified she has been offering her services as a translator to businesses and the Hamilton Police Department since 1985.
Allen testified that she read appellant his Miranda rights in Spanish. Allen also gave appellant a Miranda warning card in Spanish which appellant signed. Upon reading appellant his Miranda rights, Allen asked him if he understood he had no obligation to speak to the detectives without the presence of an attorney. Appellant indicated he understood, and stated he did not need an attorney as he had done nothing wrong. Appellant also stated that he wanted to speak to the detectives without an attorney present. Allen testified that appellant never asked for clarification while she was reading his Miranda rights in Spanish.
Allen also translated in English to the trial court what she had conveyed to appellant:
 I'm a police official. I'm advising you that you have the right to remain silent. That whatever words that you speak can be employed and will be employed against you and against your interests in a court of justice, a court of law. That it is your right to consult with a lawyer in front of the police and any time that you are being questioned. That the lawyer may be present with you while you are being interrogated or questioned. And if you don't have the means or the monetary recourse to employ a lawyer, then one will be employed * * * on your behalf, in your interest * * * during the time that you are interrogated. It's your privilege to remain quiet. At whatever point in time during the conversation that we're about to have, with me or any other police officer. Do you understand this collection of rights that I have explained to you? Since you have the understanding of these rights, do you want to speak to us without the presence of a lawyer?
After hearing the evidence at the suppression hearing, the trial court found that appellant's confession "was voluntary, [and] that it was given after the appropriate advice of [appellant's] rights * * * and after the waiver of those rights."
The trial court's findings were supported by competent and credible evidence. Allen's translation was sufficient to convey the essence of the Miranda warnings to appellant. Therefore, Miranda warnings given to appellant were not deficient. In light of all of the foregoing, we find that the trial court properly denied appellant's motion to suppress. Appellant's first assignment of error is overruled.
Assignment of Error No. 2:
 THE TRIAL COURT ERRED BY NOT EXCLUDING EVIDENCE OBTAINED FROM THE INTERROGATION OF DEFENDANT-APPELLANT, WHERE THE STATE DID NOT NOTIFY DEFENDANT-APPELLANT, A CITIZEN OF MEXICO, OF HIS RIGHTS PURSUANT TO ARTICLE 36 OF THE VIENNA CONVENTION ON CONSULAR RELATIONS, INCLUDING BUT NOT LIMITED TO HIS RIGHT TO CONTACT THE MEXICAN CONSULATE.
In this assignment of error, appellant seeks suppression of all of the state's evidence on the alternative ground that the evidence was obtained in violation of his rights as a foreign national under the Vienna Convention on Consular Relations ("VCCR").
Included in Article 36 of the VCCR is the right of an individual in custody or detention to communicate with the respective consular offices. Gomez-Silva, Butler App. No. CA2000-11-230, unreported, at 9. Suppression of evidence is a remedy normally reserved for alleged violations of constitutional rights. Hilliard v. Elfrink (1996),77 Ohio St.3d 155, 158. A treaty is regarded as equivalent to an act of the legislature. United States v. Page (C.A.6, 2000), 232 F.3d 536,540. Thus, as in the case of a statutory violation, the exclusionary rule is not an appropriate sanction, absent an underlying constitutional violation, unless the treaty expressly provides for such sanction. Id. There is no right in a criminal prosecution to have evidence excluded due to a violation of Article 36 of the VCCR.[3] Id. Appellant's second assignment of error is overruled.
Assignment of Error No. 3:
 THE TRIAL COURT ERRED BY REFUSING TO PERMIT DEFENDANT TO INTRODUCE EVIDENCE OF THE NATIONALITY OF THE DEFENDANT AT THE HEARING ON THE MOTION TO SUPPRESS.
The suppression hearing revealed that the state was unable to verify appellant's nationality. Nevertheless, appellant sought to admit at the hearing the testimony of Bobbie Hopes, M.D., a forensic psychologist who had evaluated appellant. Dr. Hopes would have testified, and such was proffered, that appellant had told her he was a Mexican national. The trial court refused to allow Dr. Hopes to so testify on the grounds that
 It has * * * absolutely no evidentiary value what [appellant] purportedly told Dr. Hopes in an interview relative to his competency and sanity to stand * * *. And she cannot, as a witness, verify whether [appellant] is or is not a Mexican national. She can't verify it. She can't * * * present any evidence different than what we already have in front of us, which is that the officers can't verify what his nationality is. * * * They have not been able to verify it at this point in time.
On appeal, appellant argues that his nationality "was relevant to set forth the basis for a claim under Article 36" of the VCCR. In light of the foregoing and our resolution of appellant's second assignment of error, we find that the trial court did not err by failing to admit evidence of appellant's alleged Mexican nationality at the suppression hearing. Appellant's third assignment of error is overruled.
Assignment of Error No. 4:
 THE FINDING OF GUILT IN THE CASE SUB JUDICE WAS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.
Appellant argues that the jury lost its way and created a manifest miscarriage of justice by finding him guilty of murder. Appellant argues that the jury should have found him guilty of voluntary manslaughter because Tracey provoked him by stealing his money and attacking him with the carpenter knife and because he was under extreme emotional stress.
In order for a court of appeals to reverse a trial court's judgment on the basis that a verdict is against the manifest weight of the evidence, the appellate court must unanimously disagree with the fact-finder's resolution of any conflicting testimony. State v. Thompkins (1997),78 Ohio St.3d 380, 389. The standard for reversal for manifest weight of evidence is as follows:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
Id. at 387. In making this analysis, the reviewing court must be mindful that the original trier of fact was in the best position to judge the credibility of witnesses and the weight to be given the evidence. Statev. DeHass (1967), 10 Ohio St.2d 230, paragraph one of the syllabus.
To support a conviction of murder, the state must show that one "purposely cause[d] the death of another[.]" R.C. 2903.02(A). One acts purposely "when it is his specific intention to cause a certain result, or, when the gist of the offense is a prohibition against conduct of a certain nature, regardless of what the offender intends to accomplish thereby, it is his specific intention to engage in conduct of that nature." R.C. 2901.22(A). The element of purpose "may be deduced from the attendant circumstances, the type of instrument used, the manner of its use, and its tendency to destroy life when used in that manner * * *."State v. Mayes (Nov. 19, 1987), Cuyahoga App. No. 53058, 1987 Ohio App. LEXIS 9671, unreported, at *3; see, also, State v. Stallings (1947),82 Ohio App. 337.
In order for a defendant on trial for murder to be convicted of voluntary manslaughter rather than murder, the defendant "bears the burden of persuading the fact finder, by a preponderance of the evidence, that he * * * acted under the influence of sudden passion or in a sudden fit of rage, either of which was brought on by serious provocation occasioned by the victim that was reasonably sufficient to incite the defendant into using deadly force[.]" State v. Rhodes
(1992), 63 Ohio St.3d 613, syllabus, certiorari denied (1997),520 U.S. 1254, 117 S.Ct. 2415; R.C. 2903.03(A).
R.C. 2903.03(A) makes clear that the sudden passion or sudden fit of rage must be "brought on by serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force[.]" R.C. 2903.03(A), therefore, sets up a cause-and-effect relationship between serious provocation and the stress that results. "In determining whether the provocation is reasonably sufficient to bring on sudden passion or a sudden fit of rage, an objective standard must be applied." State v. Shane (1992), 63 Ohio St.3d 630, 634. That is, the provocation "must be sufficient to arouse the passions of an ordinary person beyond the power of his * * * control." Id. at 635. Then, if that standard is met,
 the inquiry shifts to the subjective component of whether this actor, in this particular case, actually was under the influence of sudden passion or in a sudden fit of rage. It is only at that point that the "* * * emotional and mental state of the defendant and the conditions and circumstances that surrounded him at the time * * *" must be considered.
Id. at 634.
Dr. Hopes, a defense witness, testified that based upon appellant's social history as provided mostly by him, appellant suffered from Post Traumatic Stress Disorder ("PTSD"). The disorder was brought on by several events in appellant's life, namely (1) being severely beaten as a child by both his parents, (2) his belief that his wife was having an affair with one of his good friends, a belief which ultimately ended his marriage, and (3) being severely beaten by strangers on three different occasions after moving to Ohio, which resulted in medical attention each time, including hospitalization once. Dr. Hopes testified that symptoms of the disorder in appellant included avoidance of circumstances that might trigger memories of the initial trauma, a vague fear of being hurt, and overreaction when something triggered a memory of past abuse.
Dr. Hopes testified, in part, that appellant told her what happened as follows:
 And he said that she grabbed a knife that was in the van. * * * So he stopped the van. They fell backward. And then he felt blood on his hand. * * * He felt this warm blood and he didn't know at that point, whether it was his blood or hers. At that point he had a sudden flooding of * * * memories * * * of being abused as a kid and being left by his father, bloody and just lying there until he recovered himself[,] * * * of being left bloody in the parking lot after having bein' assaulted[,] * * * of being in the hospital after being assaulted. Also memories of his wife and being betrayed and his anger from that. * * * And he thought to himself he just wasn't gonna go back to the hospital this time. And he grabbed the knife from her; and at this point he said he just lost it and started stabbing her. * * * He doesn't really remember what happened from there. * * * He was not really aware completely of what he was doing, although he didn't try to deny that he stabbed her[,] * * * until he felt her body limp in his arms. [sic]
 Dr. Hopes explained that in responding to memories of past abuse, appellant "completely, violently overreacted. What he did was not at all in proportion as to what was going on because he wasn't responding just to what was going on at the time. * * * And he went into * * * a `blind rage.'" Dr. Hopes testified that while appellant's fight with Tracey over the knife triggered hospitalization memories, appellant was not afraid Tracey was going to kill him. Dr. Hopes also testified that when stopped by the police, appellant knew he was covering up by telling the police he had just killed a cow.
Appellant testified that he spent the majority of the evening on July 14 and the early morning hours of July 15, 2000 with friends or at bars drinking alcohol and snorting cocaine. With regard to what happened between Tracey and himself, appellant testified that when he was preventing her from leaving the van with his $40, Tracey grabbed his carpenter knife and went at him twice but was unable to strike him. Thereafter,
 I grab[bed] her hand * * * which she was holdin' the knife, and I pull[ed] her back * * * and we both fell in the middle of the van. * * * We were both strugglin' back and forth. I felt somethin' warm on my hand and I got afraid because I didn't know if it was me or her. * * * I was very nervous. * * * And then all of a suddenly [sic], all my thoughts were comin' to me really fast. And I was just strugglin' and thinking, this is happenin' to me again, and I was thinkin' about the two prior times in which I had been sent to the hospital by people that injure me. * * * I was angry because I was thinking I'm the one who's goin' back to the hospital again. * * * I was tellin' her "Let go of the knife. Let go of the knife." And she * * * wouldn't so I got angry and I struggled with her and took it away from her. * * * After I took it, I really don't remember. I don't know where else I * * * stab[bed] her in the chest. * * * When I came back to my senses, * * * I saw that there was a lot [of] blood there. * * * I remember that she was sayin', "I don't wanna die." * * * I remember then I looked at her and I was really afraid and I was really confused and afraid. * * * After that I knelt next to her and I told her, "I'm sorry. I'm sorry." * * * And then I remember that she sighed [sic] and her body went limp. [sic]
 Thereafter, appellant disposed of Tracey's body. Back in the van, appellant put the carpenter knife by the driver's seat. Appellant testified that as he was driving toward his friend's house, he was thinking of calling the hospital to tell them where Tracey was, when he was pulled over by the police. Appellant did not tell the police about Tracey until several hours later.
On cross-examination, appellant could not explain where the $40 Tracey allegedly stole from him was. Appellant testified that while it made him angry that Tracey took the $40, once he felt blood on his body, he was no longer thinking about the money. Although he always kept his tool belt in the very back of the van (where it was found by the police) and did not remember seeing the carpenter knife by the driver's seat while cleaning the van, appellant also could not explain why the knife was next to the driver's seat when he picked up Tracey. Appellant also testified that Tracey was so angry while fighting that he thought his life was in danger. Yet, Dr. Hopes testified that appellant told her he did not fear for his life while in the van with Tracey.
On cross-examination, appellant also testified that during their struggle, when Tracey still had the knife, the knife was pointing towards her. Tracey eventually dropped the knife, appellant picked it up, and "stabbed her some more." Thereafter, as Tracey tried to grab the knife back from him, appellant "got scared," lost control and kept stabbing her. Appellant also testified that it was not until he came back to his senses and Tracey was lying in the van with a gaping wound in her neck that she said she did not want to die. Yet, in his written confession, appellant stated that it was when they were fighting that Tracey kept saying she did not want to die.
Det. Rogers testified that the $40 was not in the van, not in the dumpster area where Tracey's body was recovered, not in Tracey's clothing, and not in appellant's clothing. The $40 was never recovered. Dr. Hurwitz, the pathologist who performed the autopsy on Tracey, testified that Tracey had fifty wounds on her body, including defense wounds on her hands and two wounds on her vagina. Dr. Hurwitz testified that the wounds were consistent with being stabbed. Although most of the wounds were superficial, such was not the case for one of the two wounds on the front of the neck ("the neck wound") and one of the sixteen wounds on the left breast ("the chest wound"). Dr. Hurwitz testified that the neck wound, which he considered to be the lethal wound, was two inches deep, "was as deep as it could possibly go[,] and went through Tracey's larynx, her esophagus "all the way back of her anterior neck, to hit the vertebra." The neck wound "also cut [Tracey's] right carotid artery" where it left a hole. Dr. Hurwitz explained that a person with a hole in their carotid artery "exsanguinate[s] rather rapidly."
Of the several wounds on the left breast, "there were numerous lacerations in the left upper lobe of the lung" as well as "a laceration in the right ventricle of the heart." The chest wound was four inches deep, and cut the left ventricle of the heart as well as the left third and fourth ribs. Dr. Hurwitz testified that the left third rib was actually fractured and no longer attached to the sternum, and that both ribs were cut all the way through. Dr. Hurwitz also testified that ribs were "hard" and that the knife's blade and handle had "to be in there to get four inches deep to hit those organs." Dr. Hurwitz testified that the wounds on Tracey's face and hands could be consistent with someone struggling with a knife and/or struggling to get away from an assailant armed with a knife.
For a defendant to be convicted of voluntary manslaughter rather than murder, it is not enough that the defendant be provoked into doing an act of violence; instead, the defendant must be provoked into using deadly force. In this case, appellant testified that Tracey made him angry when she tried to leave the van with the $40 and then stab him with the knife. Appellant also presented evidence that the presence of blood on his body triggered memories of past trauma which led him to stab Tracey several times.
However, appellant's assertion that Tracey pulled the knife on him did not constitute "serious provocation occasioned by the victim that is reasonably sufficient to incite the person into using deadly force" within the meaning of R.C. 2903.03. See State v. Smith (June 6, 1990), Hamilton App. No. C-880287, unreported. Nor did Tracey's alleged stealing of the $40 and refusal to give them back. State v. Smith (1991),61 Ohio St.3d 284, 291, certiorari denied (1992), 502 U.S. 1110,112 S.Ct. 1211. The jury was free to believe or disbelieve all or any part of each witness' testimony. State v. Antill (1964), 176 Ohio St. 61,67. The jury obviously did not believe that Tracey sufficiently provoked appellant or that appellant experienced a sudden passion or a sudden fit of rage. See State v. Jastrow (June 6, 2000), Franklin App. No. 99AP-931, unreported (rejecting appellant's contention that he should have been found guilty of voluntary manslaughter rather than murder based on the fact that he killed a suspected member of a Cambodian communist group which had terrorized appellant's family).
In light of all of the foregoing, and reviewing the record and weighing the evidence, we find that the jury did not lose its way or carry out a manifest miscarriage of justice by finding appellant guilty of murder rather than voluntary manslaughter. Therefore, appellant's murder conviction is not against the manifest weight of the evidence. Appellant's fourth assignment of error is overruled.
Assignment of Error No. 5:
 THE TRIAL COURT ERRED WHEN IT ADMITTED UNSUBSTANTIATED TESTIMONY REGARDING THE STATE OF MIND OF THE DEFENDANT.
Appellant argues that the trial court improperly permitted Dr. Hopes, a defense witness, and Richard Burkhart, M.D., the Butler County coroner, to testify without a scientifically valid basis for their testimony.
It is well-established that the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. State v.Sage (1987), 31 Ohio St.3d 173, paragraph two of the syllabus. An abuse of discretion connotes more than an error of law or judgment; it implies that the court's attitude is unreasonable, arbitrary, or unconscionable.State v. Adams (1980), 62 Ohio St.2d 151, 157.
Under Evid.R. 702, a witness may testify as an expert if all of the following apply:
 (A) The witness' testimony either relates to matters beyond the knowledge or experience possessed by lay persons or dispels a misconception common among lay persons;
 (B) The witness is qualified as an expert by specialized knowledge, skill, experience, training, or education regarding the subject matter of the testimony;
 (C) The witness' testimony is based on reliable scientific, technical, or other specialized information. * * *
Appellant first specifically challenges Dr. Hopes' following testimony:
 Q. [by the prosecuting attorney on cross-examination] And so an ordinary person would not have been or passions would not have been aroused to the extent that the defendant were, by what he was faced with?
 MR. PAGAN [appellant's trial counsel]: Object.
BY THE BENCH: Overruled.
* * *
 A. By what I know of what he was facing, an ordinary person wouldn't have reacted with this barrage of stabbing and cutting * * * as he did.
* * *
 Q. Was * * * the defendant's actions * * * in stabbing Tracey Roark, were they intentional?
 MR. PAGAN: Object.
BY THE BENCH: Overruled.
A. Yes, I believe he intended to stab her.
* * *
 Q. [by appellant's trial counsel on redirect examination] Do you know the legal definition of "intent" in the jury instructions?
* * *
 A. No, I'm using a common sense definition of "intent."
 Dr. Hopes' foregoing testimony followed her testimony on direct examination that appellant was suffering from PTSD, and that as a result, he "completely, violently overreacted" and "went into * * * a `blind rage.'"
We reject appellant's argument that Dr. Hopes' testimony was given without a scientifically valid basis. Dr. Hopes testified that she has been a forensic psychologist since 1987, has done over 2000 forensic psychological evaluations, and has testified as an expert witness on psychological issues both for the state and the defense. She first came in contact with appellant when she was ordered by the trial court to provide a second opinion evaluation on the issues of competency and sanity. She evaluated appellant in October 2000 and found him to be both competent to stand trial and sane at the time of the offense. Based upon her evaluation and reading of investigative reports and court documents related to the case, Dr. Hopes diagnosed appellant as suffering from PTSD. At trial, Dr. Hopes testified as to her diagnosis. Specifically, Dr. Hopes detailed the numerous symptoms she observed in appellant that assisted her, based upon her experience, in forming her diagnosis.
In addition, Dr. Hopes' testimony was based on reliable specialized information as a forensic psychologist. Dr. Hopes was qualified to testify as an expert under Evid.R. 702 by specialized knowledge and experience. Her testimony related to matters beyond the knowledge or experience possessed by lay persons. We therefore find that the trial court did not abuse its discretion in permitting Dr. Hopes' testimony, and we find no error by the trial court.
Appellant also challenges Dr. Burkhart's following testimony:
 Q. [by the prosecuting attorney on direct examination] Based upon your experience and training and education, doctor, and based upon your knowledge of the facts in this case, are you able to give an opinion as to whether * * * the knife that was used to inflict the wounds on Tracey Roark, were inflicted with the purpose of killing?
 Appellant's trial counsel successfully objected on the ground that "purpose" was a legal term and an element of the murder charge. Thereafter, the prosecuting attorney asked Dr. Burkhart whether he had "an opinion to a reasonable degree of medical certainty, whether the wounds, particularly with regard to the wound across the anterior portion of the neck [the neck wound] and to the chest, were designed to cause death?" Following the trial court's overruling of appellant's trial counsel's objection, Dr. Burkhart replied he did have an opinion.
 Q. What is that, doctor?
A. Yes.
Dr. Burkhart testified that as the county coroner for over twenty years, he has determined the cause of death of over six thousand individuals. Dr. Burkhart was present while the autopsy on Tracey was done, observed the nature and the severity of the wounds suffered by Tracey, prepared the coroner's report, and testified at trial as to Tracey's cause of death. Appellant nevertheless argues that Dr. Burkhart, as a medical expert, was unqualified to testify as to whether the neck and chest wounds were designed to cause death because such testimony went to the ultimate question of purpose.
Assuming that it was error to allow the jury to hear, over defense objection, Dr. Burkhart's testimony that the chest and neck wounds were designed to cause death, we find that the error was harmless error. When nonconstitutional errors are asserted in a criminal trial, Crim.R. 52(A) provides the governing general principle and states that "[a]ny error, defect, irregularity, or variance which does not affect substantial rights shall be disregarded." State v. Davis (1975), 44 Ohio App.2d 335,347. "The Ohio test then for determining whether the admission of inflammatory and otherwise erroneous evidence is harmless nonconstitutional error requires the reviewing court to look at the whole record, leaving out the disputed evidence, and then to decide whether there is other substantial evidence to support the guilty verdict." Id. See, also, State v. Webb (1994), 70 Ohio St.3d 325, certiorari denied (1995), 514 U.S. 1023, 115 S.Ct. 1372.
Upon carefully reviewing the whole record, disregarding Dr. Burkhart's testimony that the chest and neck wounds were designed to cause death, we find that the record demonstrates substantial evidence of appellant's guilt aside from the disputed evidence. The trial court's admission of Dr. Burkhart's foregoing testimony was therefore harmless error beyond a reasonable doubt. Appellant's fifth assignment of error is overruled.
Assignment of Error No. 6:
 THE TRIAL COURT ERRED WHEN IT ADMITTED IRRELEVANT TESTIMONY AT TRIAL.
Appellant argues that it was error to admit Dr. Burkhart's testimony regarding appellant's state of mind because such testimony was based upon an "ordinary person" standard. Appellant asserts that "[w]hether an `ordinary person' would have exhibited as an impassioned response `to the extent' of the Defendant was simply not the standard and not relevant."
Although appellant asserts that Dr. Burkhart's testimony was based upon the "ordinary person" standard regarding voluntary manslaughter, he fails to cite to any pages in the trial transcript to support his assertion. Upon reviewing Dr. Burkhart's testimony, we find that unlike Dr. Hopes' testimony, his testimony did not involve the "ordinary person" standard. Appellant's sixth assignment of error is therefore overruled.
Assignment of Error No. 7:
 THE TRIAL COURT ERRED WHEN IT ADMITTED TESTIMONY AT TRIAL WHICH WAS SUBSTANTIALLY MORE PREJUDICIAL THAN PROBATIVE.
Appellant argues that it was error to admit Dr. Burkhart's testimony that the chest and neck wounds were designed to cause death and Dr. Hopes' testimony on cross-examination because the prejudicial effect of such testimony outweighed its probative value. Specifically, appellant asserts that Dr. Hopes' testimony impermissibly led the jury to use the improper and objective "ordinary person" standard for purposes of determining whether appellant was guilty of voluntary manslaughter. Appellant also asserts that Dr. Burkhart's testimony "impermissibly allowed the Jury to replace the necessity of evaluating the physical evidence * * * to derive a conclusion as [to] the Defendant's mens rea."
Evid.R. 403(A) states that, although relevant, evidence is not admissible if its probative value is substantially outweighed by the danger of unfair prejudice, or confusion of the issues, or of misleading the jury.
Appellant was indicted on one count of murder. At trial, appellant sought to prove that he had killed Tracey in sudden passion or in a sudden fit of rage and that as a result, he should be found guilty of voluntary manslaughter. To that effect, Dr. Hopes, as a defense witness, testified on direct examination that appellant suffered from PTSD, and that as a result, he "completely, violently overreacted" to the situation with Tracey and "went into * * * a `blind rage.'" Dr. Hopes testified that what appellant did "was not at all in proportion as to what was going on[.]"
On cross-examination, the state asked Dr. Hopes "[i]f I understood you correctly, [appellant] * * * did not act the way an ordinary person would have acted * * *?" Dr. Hopes replied that appellant had overreacted. Subsequently, on two more occasions, the state elicited from Dr. Hopes her opinion that an "ordinary person" would not have been aroused or would not have reacted as did appellant to the situation he was faced with.
Upon reviewing Dr. Hopes' testimony, we fail to see how it confused or misled the jury on the issues before it. As previously noted, for a defendant on trial for murder to be convicted of voluntary manslaughter rather than murder, the defendant must set forth evidence both of objective and subjective components. Shane, 63 Ohio St.3d at 634. Initially, the analysis applies an objective standard to determine whether the provocation would arouse an ordinary person's passions beyond control. Id. It is not until this objective test is met that the analysis applies a subjective standard to determine whether this particular defendant actually was under the influence of sudden passion or sudden fit of rage. Id. In light of Shane, we find that Dr. Hopes' testimony on cross-examination was relevant and did not impermissibly lead the jury to use an improper standard. We further find that its probative value was not substantially outweighed by the danger of unfair prejudice.
With regard to Dr. Burkhart's testimony, we incorporate our analysis of appellant's fifth assignment of error under this assignment of error. Appellant's seventh assignment of error is overruled.
Assignment of Error No. 8:
 THE TRIAL COURT ERRED BY ADMITTING TESTIMONY BY THE PROSECUTION WITNESS REGARDING MATTERS BEYOND THE PERSONAL KNOWLEDGE OF THE TESTIFYING WITNESS.
Appellant argues that his state of mind was beyond Dr. Burkhart's firsthand knowledge, and that as a result, the coroner's testimony was admitted in violation of Evid.R. 602.
Evid.R. 602 provides in part that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that he has personal knowledge of the matter. Evidence to prove personal knowledge may, but need not, consist of the testimony of the witness." This rule is subject to Evid.R. 703 which provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by him or admitted in evidence at the hearing."
At trial, Dr. Burkhart testified as to Tracey's cause of death. Specifically, Dr. Burkhart testified that Tracey's death was a homicide and that she bled to death. While he did not perform the autopsy on Tracey's body, Dr. Burkhart was present while the autopsy was done. In that position, he observed the nature and the severity of the wounds suffered by Tracey, and subsequently prepared the coroner's report. A "witness's own preliminary testimony may establish that the witness was in a position to see or otherwise perceive the matters to which he or she will testify." Weissenberger's Ohio Evidence (2002), 214, Section 602.2. We find that Dr. Burkhart, as county coroner, was qualified to testify as to Tracey's cause of death because such testimony was clearly based on his personal observations. See State v. Eley (1996),77 Ohio St.3d 174, certiorari denied (1997), 521 U.S. 1124,117 S.Ct. 2522. In light of the foregoing and of our resolution of appellant's fifth assignment of error regarding Dr. Burkhart's testimony (that the chest and neck wounds were designed to cause death), appellant's eighth assignment of error is overruled.
Assignment of Error No. 9:
 THE TRIAL COURT ERRED BY ADMITTING INTO EVIDENCE THE VIDEO TAPE OF THE INTERROGATION OF DEFENDANT, THE TESTIMONY OF DETECTIVE ROGERS REGARDING THIS INTERROGATION AND STATE'S EXHIBIT 24 [APPELLANT'S CONFESSION WRITTEN BY DET. ROGERS AND SIGNED BY APPELLANT AFTER IT WAS TRANSLATED TO APPELLANT IN SPANISH].
Upon returning to the police station, Det. Rogers and another detective took appellant to an interview room to question him. Because appellant is not fluent in English, a translator, Tammy Allen, was also present in the room. Allen read appellant his Miranda rights in Spanish, and gave him aMiranda warning card in Spanish which appellant signed. Appellant agreed to speak to the detectives without an attorney present. From that point on, appellant's interrogation was videotaped. During his interrogation, appellant answered in Spanish the detectives' questions as interpreted by Allen (although appellant at times also answered directly in English), purportedly telling them how he had killed Tracey. Allen, in turn, translated appellant's answers to the detectives. Following the interrogation, Det. Rogers drafted in English a synopsis of appellant's answers. Allen then read the written confession to appellant verbatim in Spanish and appellant signed it.
At trial, Det. Rogers started testifying as to what appellant had told them during his interrogation when appellant's trial counsel asked to approach the bench. There, appellant's trial counsel successfully asked the trial court to cut off the detective's direct examination because the videotape of appellant's interrogation, in trial counsel's words, was "the more reliable evidence * * * and [spoke] for itself.]" Thereafter, the trial court instructed the jurors that they would have the videotape with them during jury deliberations, and the videotape was played to the jury without any objection. Later, during his direct examination, Det. Rogers read in its entirety, and without any objection from appellant's trial counsel, appellant's written confession (state's exhibit 24). Appellant's written confession and the videotape of his interrogation were eventually admitted into evidence as exhibits without objection from appellant's trial counsel. Allen did not testify at appellant's trial.
In this assignment of error, appellant argues that Det. Rogers' testimony regarding appellant's interrogation and written confession in English was inadmissible hearsay and violated his rights under the Sixth Amendment Confrontation Clause because the detective was not able to understand appellant's statements directly, but only heard them as translated by Allen who did not testify at trial. Similarly, appellant argues that Allen's statements in English to the detectives on the videotape were inadmissible hearsay and violated the confrontation clause.
We note at the outset that there were no objections made on the ground of hearsay, or otherwise, to the detective's testimony regarding appellant's interrogation and written confession or to the playing and admission of the videotape. As a result, we review this assignment of error for plain error.
Pursuant to Crim.R. 52(B), "plain errors or defects affecting substantial rights may be noticed although they were not brought to the attention of the court." In order to find plain error, it must be clear from the record that an error was committed and that, but for the error, the result of the trial clearly would have been otherwise. State v.Williford (1990), 49 Ohio St.3d 247, 252. The plain error rule must be applied with the utmost caution and invoked only under exceptional circumstances to prevent a manifest miscarriage of justice. State v.Cooperrider (1983), 4 Ohio St.3d 226, 227.
As already noted, the admission or exclusion of relevant evidence rests within the sound discretion of the trial court. Sage, 31 Ohio St.3d at paragraph two of the syllabus. The right to confrontation does not necessarily prohibit the admission of hearsay statements against a criminal defendant. Idaho v. Wright (1990), 497 U.S. 805, 814,110 S.Ct. 3139, 3146. Hearsay statements are deemed sufficiently reliable to allow their admission without the benefit of cross-examination when the statements (1) fall within a firmly rooted hearsay exception, or (2) bear adequate indicia of reliability. Id. at 814-815, 110 S.Ct. at 3146.
In this assignment of error, appellant essentially challenges the admission of his statements made via an interpreter. Before we address the alleged confrontation clause violation, we must first consider whether Allen, the interpreter, or appellant should be viewed as the declarant. United States v. Namezian (C.A.9, 1991), 948 F.2d 522, 525, certiorari denied (1992), 506 U.S. 835, 113 S.Ct. 107. If the statements are properly viewed as appellant's own, there is no confrontation clause issue because appellant cannot claim that he was denied the opportunity to confront himself. Id. at 526. This threshold question likewise controls the hearsay analysis. If the statements are viewed as appellant's own, they constitute admissions by party-opponent under Evid.R. 801(D)(2) and are therefore not hearsay. See id.
Although seemingly an issue of first impression in Ohio, some of the federal courts that have considered the question have held that the interpreter may in some circumstances be viewed as an agent of the defendant, and the translation hence be attributable to the defendant as his own admission. See, e.g., United States v. Alvarez (C.A.11, 1985),755 F.2d 830, certiorari denied (1985), 474 U.S. 905, 106 S.Ct. 274. Other federal courts have held that except in unusual circumstances, an interpreter is no more than a "language conduit" and therefore the interpreter's translation is not inadmissible hearsay. See, e.g., UnitedStates v. Koskerides (C.A.2, 1989), 877 F.2d 1129.
The record shows that Allen had no role other than translating statements between the detectives and appellant, and was clearly viewed as an interpreter by all parties during the course of appellant's interrogation. Allen translated appellant's statements concurrently as made. There is nothing in the record to suggest Allen had any motive to mislead or distort, and there is no indication that her translation was inaccurate. Finding the language conduit analysis persuasive, and reviewing this assignment of error only for plain error, we hold that Allen was nothing more than a language conduit between appellant and the detectives. As a result, the translations can be attributed directly to appellant as his own admissions, which are not hearsay under Evid.R. 801(D)(2). Nazemian, 948 F.2d at 528.
Because appellant and Allen are treated as identical for testimonial purposes, neither the admission of Det. Rogers' testimony regarding appellant's interrogation and written confession nor the admission of Allen's statements in English to the detectives on the videotape created a confrontation clause or hearsay problems. Id. It was therefore not plainly erroneous for the trial court to admit the videotape of appellant's interrogation or the detective's testimony regarding appellant's interrogation and written confession. Appellant's ninth assignment of error is overruled.
Assignment of Error No. 10:
 THE TRIAL COURT COMMITTED SO MANY CUMULATIVE ERRORS WARRANTING A REVERSAL OF DEFENDANT-APPELLANT'S CONVICTION.
Although a particular error might not constitute prejudicial error in and of itself, a conviction may be reversed if the cumulative effect of the errors deprive a defendant of a fair trial, despite the fact that each error individually does not constitute cause for reversal. Statev. Fears (1999), 86 Ohio St.3d 329, 348, certiorari denied (2000),529 U.S. 1039, 120 S.Ct. 1535. The doctrine of cumulative error is not applicable where a defendant fails to establish multiple instances of harmless error during the course of the trial. State v. Garner (1995),74 Ohio St.3d 49, 64, certiorari denied (1996), 517 U.S. 1147,116 S.Ct. 1444. Since this court has found no instance of error in the trial court below, the doctrine of cumulative error is not applicable and appellant's tenth assignment of error is overruled.
Assignment of Error No. 11:
 THE TRIAL COURT ERRED BY IMPOSING COSTS IN THE CASE SUB JUDICE.
Because R.C. 2929.02(B) mandates a fifteen year to life sentence for anyone convicted of murder in violation of R.C. 2903.02, there was no sentencing hearing in the case at bar. Rather, immediately following the jury's verdict, the trial court sentenced appellant to an indefinite prison term of 15 years to life. By judgment of conviction entry filed February 9, 2001, the trial court ordered appellant "to pay all costs of prosecution, counsel costs and any fees permitted pursuant to [R.C.] 2929.18(A)(4)." Appellant argues that it was error for the trial court to impose the foregoing costs and fines without first considering appellant's current and future ability to pay.
We note at the outset that a distinction exists in Ohio between the imposition of fines and court costs: "In both criminal and civil cases, costs are taxed against certain litigants for the purpose of lightening the burden on taxpayers financing the court system. [S]tatutory provisions for payment of court costs were not enacted to serve a punitive, retributive, or rehabilitative purpose, as are fines."Strattman v. Studt (1969), 20 Ohio St.2d 95, 102.
R.C. 2947.23 governs costs of prosecution and jury fees and provides in relevant part that "[i]n all criminal cases * * *, the judge or magistrate shall include in the sentence the costs of prosecution and render a judgment against the defendant for such costs." Unlike the statutory provisions governing fines and court-appointed attorney fees, R.C. 2947.23 does not require a trial court to consider a defendant's ability to pay costs of prosecution. Based upon the plain language of R.C. 2947.23, we find that the trial court properly ordered appellant to pay the costs of prosecution.
R.C. 2941.51 governs court-appointed attorney fees and provides in relevant part that
 (A) Counsel appointed to a case * * *, or otherwise appointed by the court, * * * shall be paid for their services by the county the compensation and expenses that the trial court approves. * * *
* * *
 (D) The fees and expenses approved by the court under this section shall not be taxed as part of the costs and shall be paid by the county. However, if the person represented has, or reasonably may be expected to have, the means to meet some part of the cost of the services rendered to the person, the person shall pay the county an amount that the person reasonably can be expected to pay.
A trial court may require an indigent defendant to pay the cost of his court-appointed attorney only after the court makes an affirmative determination on the record in the form of a journal entry, that the defendant has, or reasonably may be expected to have, the means to pay all or some part of the cost of the legal services rendered to him.State v. Cooper (Feb. 19, 2002), Butler App. No. CA2001-03-063, unreported, at 20. In the case at bar, the trial court made no determination on the record that appellant was able to pay or could reasonably be expected to pay for his court-appointed attorney. As a result, we find that the trial court erred by ordering appellant to pay such fees, and remand to the trial court for a determination of whether appellant is able to pay or can reasonably be expected to pay the costs of his court-appointed attorney.
In addition to imposing court costs pursuant to R.C. 2947.23, a trial court may also impose financial sanctions upon felony offenders. R.C.2929.18(A). Before it imposes such sanctions, however, the trial court "shall consider the offender's present and future ability to pay the amount of the sanction or fine." R.C. 2929.19(B)(6). There are no express factors that must be considered or specific findings that must be made. State v. Martin (2000), 140 Ohio App.3d 326, 338. The trial court is not required to hold a hearing to comply with R.C. 2929.19(B)(6), although it may choose to do so pursuant to R.C. 2929.18(E). "All that is required under R.C. 2929.19(B)(6) is that the trial court `consider the offender's present or future ability to pay.'" Id.
There is no evidence in the record that the trial court considered, even cursorily, appellant's present and future ability to pay the financial sanctions it imposed under R.C. 2929.18(A)(4). "Because the court must comply with the legislature's mandate under R.C. 2929.19(B)(6),"State v. Adkins (2001), 144 Ohio App.3d 633, 647, we reverse the trial court's imposition of financial sanctions and remand with instructions that the trial court consider appellant's present and future ability to pay the financial sanctions. Appellant's eleventh assignment of error is sustained in part and overruled in part.
We reverse the judgment of the trial court as to court-appointed counsel fees and financial sanctions, and affirm the judgment in all other respects. The matter is remanded to the trial court for a determination of whether appellant is able or will be able to pay the costs of his court-appointed counsel and the financial sanctions.
YOUNG, P.J., and WALSH, J., concur.
[1] Additional facts will be discussed and developed throughout the decision as are necessary to the resolution of appellant's assignments of error.
[2] Curiously, appellant also asserts at the end of this assignment of error that "[f]or the aforementioned reasons the convictions * * * should be reversed, and * * * [his] constitutional and international rights should be excluded from trial."
[3] "According to the State Department, `[t]he only remedies for failures of consular notification under the Vienna Convention are diplomatic, political, or exist between states under international law.'"United States v. Bin Laden (S.D.N.Y. 2001), 132 F. Supp.2d 168,196.